UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 17, 2016
```

------------------------------------------------------X
                                                  :

JEAN D. HANNON,                       :
                                                  :

                      Plaintiff,     :      15 Civ. 4035 (KPF)
                                                    :

                      v.           :      <u>OPINION AND ORDER</u>
                                                    :

COMMISSIONER OF SOCIAL SECURITY,  :
                                                  :

                      Defendant.  :
                                                  :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

Plaintiff Jean Hannon filed this *pro se* action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security (the "Commissioner") denying Hannon's application for Social Security Disability Insurance benefits based on a finding that Hannon did not meet the Act's criteria for disability. The parties have filed cross-motions for judgment on the pleadings. Because the Administrative Law Judge (the "ALJ") properly considered the record and issued an opinion supported by substantial evidence, Defendant's motion is granted; Plaintiff's motion is denied; and the Commissioner's decision is affirmed.

# BACKGROUND[1]

Hannon filed her Title II application for Disability Insurance benefits on April 3, 2012, alleging disability as of February 28, 2012.  (SSA Rec. 213).  The Commissioner notified Hannon that her claim had been denied on October 19, 2012.  (*Id.* at 138).  Hannon subsequently requested, and on October 2, 2013, received, a hearing (the "Hearing") before ALJ Mark Solomon, pursuant to 20 C.F.R. § 404.929, at which she appeared with counsel and testified on her own behalf.  (*Id.* at 1-23, 150).

## A.   Hannon's Testimony Regarding Her Circumstances and Impairments

At the Hearing, Hannon stated that she was born on August 11, 1959, and that she had received a high school diploma.  (SSA Rec. 7).  While she had not been working since February 2012, she testified to being previously employed for three years as a home health aide.  (*Id.* at 8, 11).  Prior to working as a home health aide, Hannon served as a park cleaner for the City of New York for approximately a year; a seasonal mail handler for the United States Postal Service for several years; and a part-time cashier at a Wendy's restaurant for approximately a year.  (*Id.* at 9-10).

Hannon testified that she left her position as a home health aide due to medical concerns; specifically, pain in her right knee, and heart troubles that required the placement of a stent in March 2012.  (SSA Rec. 11).  While she did

---

[1]   The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #12) filed by the Commissioner.  For convenience, Defendant's supporting memorandum (Dkt. #14) is referred to as "Def. Br."; Plaintiff's supporting memorandum (Dkt. #17) as "Pl. Br."; and Defendant's response and reply (Dkt. #18) as "Def. Reply."

not have a cane with her at the Hearing, she stated that she used one once or twice a week on occasions when her knee became stiff and swollen. (*Id.* at 11-12). She stated that she was capable of taking public transportation by herself, and reported being able to perform daily activities such as dressing, bathing, cooking, and sweeping. (*Id.* at 12-13). She further stated, however, that she did not shop or do laundry, as she was unable to lift anything heavy. (*Id.* at 13). She described spending her free time watching television and reading, and noted that she took weekly walks of about eight blocks in length. (*Id.* at 14).

Hannon stated that she experienced lower back pain while sitting and at night, and estimated that she could continuously sit for two hours; stand for an hour or an hour and a half; and lift no more than 10 pounds. (SSA Rec. 15). In response to questions from the ALJ, Hannon explained that she had been unable to have surgery performed on her knee due to her heart medication, and that as a result she had persistent knee pain. (*Id.*).

**B.     Hannon's Treatment Evidence**

**1.     Hannon's Treatment at Patel MD and Her First Cardiac Catheterization**

On September 29, 2010, Plaintiff presented at Patel MD with complaints of intermittent chest pain radiating down her right arm and shortness of breath. (SSA Rec. 354). She was seen by Dr. Rajendra Patel ("Dr. R. Patel"), who ordered a stress test and echocardiogram. (*Id.*). The echocardiogram showed normal left and right ventricles, normal left and right atria, and normal aortic root, but "moderate aortic insufficiency" and "mild tricuspid regurgitation." (*Id.* at 360).

On October 15, 2010, Dr. R. Patel performed a cardiac catheterization on Hannon, successfully placing two stents.  (SSA Rec. 287-88, 299).  Dr. R. Patel saw Hannon for a follow-up appointment on October 20, 2010, at which point he observed that Hannon's heart rate, sounds, and ejection were normal, though he noted the presence of a systolic murmur.  (*Id.* at 577).  At a second follow-up, on October 25, 2010, Hannon reported weakness, but no chest pain, dizziness, or shortness of breath.  (*Id.* at 352).  Hannon attended additional follow-up appointments on November 8, 2010, and December 11, 2010, at the latter of which she received a letter stating that she could "return to work without restriction."  (*Id.* at 350-51).

Dr. R. Patel's notes from January 19, 2011, state that Hannon reported no chest pain, and that she had "[s]ignificantly better ambulatory capacity." (SSA Rec. 349).  He reiterated that "[s]he may return to previous full duty work without restrictions."  (*Id.*).  A few days later, on January 22, Hannon was seen by Dr. Hemant Patel ("Dr. H. Patel"), who similarly recorded no chest pain, and observed that her joints had no swelling, no deformity, and good range of motion.  (*Id.* at 348).  The following month, on February 23, and again on May 4, Dr. R. Patel saw Hannon and noted each time that she reported a "lot of chest pain, both exertional and non-exertional," though her ambulatory capacity continued to improve.  (*Id.* at 346-47).  Hannon's functions during both visits were generally normal.  (*Id.*).

Dr. H. Patel's records from two visits in August 2011 reflect normal functioning, intact gait, and normal posture, with no note of chest pain.  (SSA

4

Rec. 342-44).  His notes from an appointment on December 13, 2011, however, reflect returned knee pain, as well as "burning chest discomfort" occurring "mostly [with] walking intermittently" and "after use of sugary stuff." (*Id.* at 340).  Dr. H. Patel's physical examination findings at that visit were largely normal, including good range of motion in all joints and a regular heart rate with no murmurs; he scheduled a cardiology appointment to follow up.  (*Id.*).  An ultrasound report ordered by Dr. H. Patel on January 23, 2012, indicated mild aortic insufficiency and mildly elevated pulmonary artery pressure.  (*Id.* at 339).

### 2.   Hannon's Second Cardiac Catheterization and Follow-Up Treatment

On February 27, 2012, Hannon saw Dr. R. Patel for frequent angina symptoms.  (SSA Rec. 572).  After conducting an examination, Dr. R. Patel diagnosed Hannon as primarily suffering from angina, for which he ordered a nuclear stress test.  (*Id.* at 572-73).  The stress test results were abnormal.  (*Id.* at 382-83).

As a result of the abnormal stress test results, Hannon received a left heart catheterization on March 2, 2012.  (SSA Rec. 382).  The procedure was complicated by a wire-induced coronary artery perforation, which caused Hannon to become severely hypertensive and to experience acute pericardial effusion.  (*Id.* at 382-83, 570).  Hannon was hospitalized until March 6, 2012, at which point her pericardial effusion and hypertension had improved.  (*Id.* at 382).

The following week, on March 13, Hannon attended an appointment with Dr. R. Patel, during which she reported no angina symptoms. (SSA Rec. 570). Dr. R. Patel examined her heart and reported a normal point of maximal impulse ("PMI"), regular rate and rhythm, and normal sounds, though there was a systolic ejection murmur. (*Id.*).[2] She had normal extremities, peripheral pulses, and motor strength. (*Id.*). Plaintiff had a number of follow-up visits at Patel MD, on March 27, 2012, April 10, 2012, May 8, 2012, and July 10, 2012. (*Id.* at 562-68). At each visit the physical examination findings were unremarkable and continued to reflect normal extremities, peripheral pulses, and motor strength. (*Id.*).

On August 14, 2012, Hannon related that she had "started to have chest pains," but Dr. R. Patel noted that it was "all atypical and probably musculoskeletal in nature." (SSA Rec. 560). He additionally stated that Hannon was "[a]ble to walk very well," and the findings of his physical examination were normal, save Hannon's continued systolic ejection murmur. (*Id.*). Dr. R. Patel noted that Hannon should not lift more than 10 pounds, though this limitation is not reiterated in his notes from a follow-up visit on September 11, 2012. (*Id.* at 561, 666-67). At that September 11 follow-up, Dr. R. Patel recorded "[n]o angina symptoms," and "[m]ostly resolved" chest pain. (*Id.* at 666). His other physical examination findings were normal, including

---

[2]     The point of maximal impulse is precisely that: "the point where there is a maximal impulse against the chest that can be felt," usually at the apex of the heart. Some conditions, however, may cause the PMI to occur somewhere other than the apex. *Precordial Movements*, http://stanfordmedicine25.stanford.edu/the25/precordial.html (last visited June 17, 2016).

6

normal motor strength in both upper and lower extremities.  (*Id.* at 666-67).
On November 13, 2012, Dr. R. Patel again described Hannon's chest pain as
"[m]ostly resolved," and stated that Hannon had "[g]enerally good functional
status except for complaints of precordial pains when [she] carries heavy
weight at work."  (*Id.* at 663).

On January 8, 2013, Hannon informed Dr. R. Patel that her chest pain
had returned, though it was "vague and atypical," lasting "only for seconds."
(SSA Rec. 661).  Dr. R. Patel continued to report Hannon's functional status as
"good," though noting continued precordial pain when lifting heavy objects at
work.  (*Id.*).  His treatment notes reflect normal findings in regard to Hannon's
heart, lungs, peripheral pulses, extremities, and motor strength.  (*Id.* at 661-
62).  Dr. R. Patel's notes from an appointment with Hannon in August 2013
indicate the same findings.  (*Id.* at 659-60).

### 3.    Hannon's Treatment for Knee and Back Pain

In 2006, Hannon received an X-ray and a magnetic resonance image
("MRI") of her right knee, as well as an MRI of her spine, at Bronx-Lebanon
Hospital Center ("Bronx-Lebanon").  (SSA Rec. 357, 361).  While the X-ray was
largely normal, the MRI of her knee showed a small tear of her medial
meniscus, and the MRI of her spine showed disc desiccation and "very
minimal" right posterior paracentral disc projection at the L5-S1 vertebrae.  (*Id.*
at 356, 361).

On August 7, 2010, Hannon attended an appointment at Patel MD,
during which she informed Dr. Naveenkumar Pesala that she had been

experiencing pain in both knees and her chest wall for the previous eight weeks.  (SSA Rec. 355).  While Dr. Pesala's examination revealed some left knee tenderness, her findings were otherwise normal.  (*Id.*).  She nevertheless referred Hannon to an orthopedist, Dr. Tarek Mardam-Bey, for further examination of Hannon's knees.  (*Id.* at 552).  Dr. Mardam-Bey saw Hannon the following month, diagnosed her with a probable torn lateral meniscus in her right knee, and recommended that she receive an MRI.  (*Id.* at 552).[3]

Hannon again saw Dr. Mardam-Bey on February 20, 2012, for right knee pain that increased with walking, climbing stairs, and squatting.  (SSA Rec. 553).  An MRI ordered by Dr. Mardam-Bey at that time indicated a large tear of Hannon's posterior horn and the body of the medial meniscus; fraying of the lateral meniscus; extensive osteochondral disease of the posterior aspect of the lateral tibial plateau; small osteochondral lesion of the medial aspect of the trochlear groove of the femur; and edema at the origin of the patellar tendon.  (*Id.* at 554).  On March 1, 2012, Dr. Mardam-Bey injected Depo-Medrol and Xylocaine into Hannon's right knee, and noted that Hannon was taking Plavix for her heart condition, which she would need to stop taking if she was to undergo knee surgery.  (*Id.* at 553).  On April 3, 2012, Dr. Mardam-Bey observed that Hannon's knee was not improving with anti-inflammatories, and referred her to another physician for Synvise injections.  (*Id.*).

On July 10, 2012, Dr. Roger L. Smoke saw Plaintiff for complaints of right knee and lower back pain, as well as numbness in her fingers, headaches,

---

[3]      The file does not contain any record of a 2010 MRI.

8

and difficulty sleeping. (SSA Rec. 622). Dr. Smoke's physical findings were, however, largely normal: He reported full motor strength; normal muscle tone, gait, and sensation; no tenderness in Hannon's back; no spinal deviation; normal extremities; and a normal cardiac examination. (*Id.* at 623). His findings were similarly unremarkable at a second appointment on October 2, 2012. (*Id.* at 628-29).

Plaintiff began physical therapy for her knee pain at Harlem Hospital Center ("HCC") on December 20, 2012. (SSA Rec. 617-18). Notes from her initial session indicate that she could function independently, but that she had limited range of motion in her right knee. (*Id.* at 617-18). Her initial visit notes indicate, among other things, that she lived in a third-floor walk-up. (*Id.* at 614). Notes from a second visit to HHC, on January 9, 2013, state that Hannon had good balance; intact deep pressure on the left and impaired deep pressure on the right; reduced extension and flexion of the right knee; and reduced strength in her lower extremities. (*Id.* at 615). Hannon reported being able to walk approximately six blocks without pain and could walk without any assistive device, though her gait was antalgic. (*Id.* at 614, 616). She reported increased pain when climbing stairs. (*Id.* at 614).

Hannon attended four additional physical therapy sessions at HHC during January and February of 2013. (SSA Rec. 608-13). Each session involved between 45 and 60 minutes of treatment, which Hannon "tolerated … without distress." (*Id.*). Hannon performed exercises as part of each treatment, including three sets of 20 gym squats, and three sets of 10 step-ups

9

with five-pounds of added weight.  (*Id.*).  Hannon continued to report right knee pain at a level of seven or eight out of ten, and during one of these sessions Hannon received a cane to assist her with walking and to "prevent falls."  (*Id.* at 608, 610).

A further visit with Dr. Smoke in January 2013 yielded normal findings: Dr. Smoke recorded normal heart sounds and normal gait, and repeated those findings in April, July, and September of 2013, though he did note Hannon's report that physical therapy was not improving her knee pain.  (SSA Rec. 631, 633-37, 698-700).  At the July appointment, Dr. Smoke additionally noted that Hannon described her chest as "not feeling right," and that she was experiencing headaches and numbness in her right hand.  (*Id.* at 636).

## C.   Evidence from Hannon's Consultative Examination

On October 2, 2012, Dr. Vinod Thukral performed a consultative examination of Hannon at the request of the Commissioner.  (SSA Rec. 592). Hannon informed Dr. Thukral of her previous stent placements and her history of back and knee pain.  (*Id.*).  Hannon additionally told Dr. Thukral that she could cook, clean, shop, and do laundry as needed, but that she required assistance doing those things as a result of her back and right knee pain.  (*Id.* at 593).

Dr. Thukral's physical examination notes state that Hannon walked with a normal gait, with no assistive device, and could walk on her heels and toes without difficulty.  (SSA Rec. 594).  She could rise from her chair without difficulty, but could only partially squat due to back and knee pain.  (*Id.*).  Dr.

10

Thukral's notes indicate that Hannon had full flexion and extension in her spine, as well as a full range of motion in both knees.  (*Id.*).  Her joints were stable and not tender, with no redness, heat, swelling, or effusion, and she had full strength in both upper and lower extremities.  (*Id.*).  Dr. Thukral's examination of Hannon's chest and heart revealed normal findings, with a regular heart rhythm and no audible murmur, gallop, or rub.  (*Id.* at 595).

Dr. Thukral's medical source statement opined that Hannon had no limitations on her ability to sit or stand, but that her "capacity to climb, pull, push, lift[], and carry heavy objects may be moderately limited due to a history of coronary artery disease (CAD)."  (SSA Rec. 596).  He further stated that she "should avoid activities requiring moderate or greater exertion due to history of CAD."  (*Id.*).

## D.   Hearing Testimony from the Vocational Expert

At the Hearing, the ALJ called Vocational Expert ("VE") Dr. Gerald Belchik to testify regarding Hannon's previous work and any jobs in the market that she might be able to perform.  Dr. Belchik classified Hannon's previous work as follows: home health aide is an unskilled position with a specific vocational preparation ("SVP") of 2 and a medium exertion level; park maintenance worker is an unskilled position with an SVP of 2 and a medium exertion level; seasonal mail handler is a semi-skilled position with an SVP of 4 and a light exertion level; and cashier is a semi-skilled position with an SVP of 3 and a light exertion level.  (SSA Rec. 17-18).  Dr. Belchik opined that Hannon had performed her job as a seasonal mail handler long enough to have learned

the skills associated with that position.  (*Id.* at 18).  Dr. Belchik found that Hannon had no transferable skills.  (*Id.* at 19).

The ALJ offered to Dr. Belchik a hypothetical individual who was able to sit for six hours; stand and walk for up to six hours; lift and carry 20 pounds occasionally and 10 pounds frequently; could not climb ropes, ladders, and scaffolds, but could occasionally climb ramps and stairs; could frequently perform balancing, stooping, kneeling, and crouching; and could occasionally crawl.  (SSA Rec. 18-19).  The ALJ asked Dr. Belchik if the described individual could perform any of Hannon's past work, to which Dr. Belchik replied that such a person could perform the mail handler or cashier positions, but could not serve as a home health aide or park maintenance worker.  (*Id.* at 19).  The ALJ then modified the hypothetical, asking whether the same individual could do any of Hannon's past work if she also required the use of a cane for up to one-third of the day to assist with balancing.  (*Id.*).  Dr. Belchik stated that this individual could not serve as a mail handler, but could still perform the duties of a cashier.  (*Id.*).

Dr. Belchik testified that the hypothetical individual posed by the ALJ could, if not using a cane, also perform the positions of production assembler or house cleaner, both of which are unskilled jobs with an SVP of 2 and a light exertion level.  (SSA Rec. 20).  For the hypothetical individual who additionally required the use of a cane for up to one-third of the day, Dr. Belchik testified that such a person could not perform the production assembler or house cleaner positions, but could perform the job of cashier or of packager, the latter

12

of which is an unskilled position with an SVP of 2 and a light exertion level. (*Id.* at 21).

**E.    The ALJ's Opinion Denying Hannon's Application for Benefits**

The ALJ issued a notice of unfavorable decision on November 15, 2013. (SSA Rec. 112).  In his accompanying opinion, the ALJ walked through the SSA's prescribed five-step analysis for evaluating disability claims.  *See* 20 C.F.R. § 404.1520(a)(1).[4]  As a threshold matter, the ALJ found that Hannon met the insured status requirements of the Act through December 31, 2014, meaning that Hannon would need to establish disability on or before that date. (SSA Rec. 117).[5]  Next, the ALJ determined that Hannon had satisfied steps one and two of the disability analysis: (i) Hannon had not engaged in substantial gainful activity since the alleged onset date of her disability, and

---

[4]      The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[5]      *See* 42 U.S.C. § 423(c) (setting forth insurance definitions and requirements for disability claimants).

13

(ii) she had two severe impairments — coronary artery disease ("CAD") and history of a right knee tear.  (*Id.* (citing 20 C.F.R. §§ 404.1571 *et seq.*, 20 C.F.R. 404.1520(c)).

Because Hannon had established the existence of severe impairments, the ALJ next considered whether either of these impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, such that Hannon would presumptively qualify as disabled.  (SSA Rec. 118).  The ALJ found that Hannon satisfied neither the listing for musculoskeletal disorders nor that for cardiovascular disorders, nor indeed for any other listed impairment.  (*Id.*).

The ALJ then proceeded to step four of the SSA disability analysis, which requires an ALJ to determine the highest level of work that a claimant could perform given her impairments — her residual functional capacity ("RFC").  20 C.F.R. §§ 404.1545, 404.1520.  The ALJ found that Hannon had the RFC to perform "less than the full range of light work": Specifically, Hannon could sit, stand, and walk for six hours during an eight-hour workday; lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; occasionally climb stairs or ramps, or crawl; frequently balance, stoop, kneel, or crouch; and that she was restricted from climbing ropes, ladders, or scaffolds.  (SSA Rec. 118).  In making this determination, the ALJ adhered to a set two-step process.  First, he determined whether a medically determinable impairment, physical or mental, had been shown that could reasonably be expected to produce Hannon's symptoms.  (*Id.* at 118-19).  Second, after finding such impairments,

the ALJ evaluated the intensity, persistence, and limiting effects of Hannon's symptoms to determine the extent to which they limited her functioning.  (*Id.* at 119).  The ALJ explained that "[f]or this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [an ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  (*Id.*).

Applying this two-step process, the ALJ found that while Hannon's medically determinable impairments could reasonably be expected to produce her alleged symptoms, her reports regarding the intensity, persistence, and limiting effects of those symptoms lacked credibility in light of the record.  (SSA Rec. 119-20).  Specifically, the ALJ explicitly considered reports from Hannon's treating physicians, Drs. R. Patel and H. Patel, recorded during her numerous visits in 2012 and 2013.  (*Id.* at 120).  He additionally considered notes from her physical therapy sessions at HHC and from Dr. Smoke,[6] while also generally noting that he "considered all records and reports submitted by the claimant."  (*Id.*).  He additionally discussed the findings from Hannon's consultative examination with Dr. Thukral, whose opinion the ALJ afforded "substantial weight" because it was "consistent with the medical evidence in the file."  (*Id.* at 120-21).  The ALJ observed that Hannon's file did "not appear to contain any opinions by treating sources."  (*Id.* at 121).

---

[6]     While the ALJ does not reference Dr. Smoke by name, he cites treatment notes from an examination performed by Dr. Smoke on September 24, 2013.  (SSA Rec. 120).

Having determined that Hannon was able to perform less than the full range of light work, the ALJ proceeded to step five of the disability assessment, asking whether Hannon could perform her past relevant work. (SSA Rec. 121). He determined that Hannon could indeed perform her past relevant work as a mail handler and as a cashier, as such work was not precluded by the limitations identified in her RFC. (*Id.*). The ALJ cited testimony from the VE, who had opined that Hannon could perform the role of cashier even using a cane occasionally — though the ALJ noted that he did not find the use of a cane to be medically necessary. (*Id.*). The ALJ also recounted the VE's statement that the claimant could perform *other* jobs at the light level existing in significant numbers in the national economy, such as production assembly worker, cleaner, or packager; the last of which she could again perform even with the occasional use of a cane. (*Id.*). Because the ALJ found that Hannon could perform the requirements of a range of light work — albeit not the full range — he found that she did not qualify as disabled under the Act at that time. (*Id.* at 122).

**F.      The Appeals Council's Denial of Review and the Instant Litigation**

On November 15, 2013, Hannon filed a request for review of the ALJ's decision denying her disability benefits, supplementing her application with additional evidence. (SSA Rec. 25, 32-103, 109-10). Specifically, Hannon included treatment notes from Dr. Mardam-Bey and records from the Federation of Employment and Guidance Services' ("FEGS") WeCARE

program,[7] both dated May 2014, and a wellness report from Dr. Paul Hobeika, dated October 2014.  (SSA Rec. 32-103).  The Appeals Council responded on April 9, 2015, finding no reason to review the ALJ's decision and therefore denying Hannon's request.  (*Id.* at 25).

Hannon, acting *pro se*, proceeded to file for relief in this Court on May 15, 2015.  (Dkt. #2).  Following two extensions of the Commissioner's time to respond to the Complaint, both of which were granted with Hannon's consent, the Commissioner filed the Administrative Record and her answer on January 15, 2016.  (Dkt. #7, 10-12).  That same day, the Commissioner filed her motion for judgment on the pleadings.  (Dkt. #13-14).  Hannon filed an affidavit seeking reversal of the ALJ's determination, which the Court construes as a cross-motion for judgment on the pleadings, on March 10, 2016.  (Dkt. #17).  The Commissioner concluded the briefing by filing her response and reply on March 25, 2016.  (Dkt. #18).

---

[7]      FEGS no longer exists, and WeCARE is now run by Fedcap.  Fedcap's website states that "WeCARE, the New York City Human Resources Administration's Wellness, Comprehensive Assessment, Rehabilitation and Employment program, addresses the needs of cash assistance clients with medical and/or mental health barriers to employment by providing customized assistance and services to help them achieve their highest levels of self-sufficiency."  http://www.fedcap.org/content/wecare (last visited June 17, 2016).

## DISCUSSION

**A.    Applicable Law**

**1.    Motions Under Federal Rule of Civil Procedure 12(c)**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy*, LLC, 647 F.3d 419, 429 (2d Cir. 2011). When considering either type of motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); s*ee also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [Plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

2.      **Review of Determinations by the Commissioner of Social Security**

In order to qualify for disability benefits under the Act, a claimant must demonstrate her "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

In reviewing the final decision of the SSA, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A court must uphold a final administrative determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian* v. *Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting *Talavera* v. *Astrue*,

697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g) ("If there is

substantial evidence to support the determination, it must be upheld.").  Where

administrative findings are supported by substantial evidence, those findings

are "conclusive." *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The

findings of the [Commissioner] are conclusive unless they are not supported by

substantial evidence."  (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402

U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential

standard of review — even more so than the clearly erroneous standard."

*Brault* v. *Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation

omitted).  To make the determination of whether the SSA's findings were

supported by substantial evidence, "the reviewing court is required to examine

the entire record, including contradictory evidence and evidence from which

conflicting inferences can be drawn." *Talavera*, 697 F.3d at 151 (quoting

*Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

Finally, the presiding ALJ has an affirmative obligation to develop the

administrative record.  *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09

(2d Cir. 2009); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL

2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47

(2d Cir. 1996)).  This means that the ALJ shall "make every reasonable effort to

obtain from the individual's treating physician (or other treating health care

provider) all medical evidence, including diagnostic tests, necessary in order to properly make" a determination as to the claimant's disability.  42 U.S.C. § 423(d)(5)(B).

## B.    Analysis

### 1.    The ALJ Properly Considered the Evidence in the Record

The Commissioner asserts that the ALJ's decision is supported by substantial evidence in the record, and should therefore be affirmed.  (Def. Br. 16-23).  Hannon argues in response that the ALJ "ignored the medical evidence from [her] treating doctors," instead relying on the opinion of the consultative examiner in making his decision.  (Pl. Br. ¶¶ 6, 12, 15).  Upon reviewing the record, the Court agrees with the Commissioner.

Under the so-called "treating physician rule," a treating physician's opinion regarding a claimant's impairments is given controlling weight to the extent it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Halloran* v. *Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004).  In the present instance, however, it is not opinion evidence that Hannon argues the ALJ failed to consider, but rather objective diagnostic reports and treatment notes.[8]  Hannon specifically

---

[8]    As the ALJ noted, the record presented to the ALJ contained no opinion evidence from any of Hannon's treating physicians.  (SSA Rec. 121).

The Court acknowledges that an ALJ has a duty to develop the record.  This includes a duty to resolve apparent ambiguities relevant to the ALJ's disability determination, *see Corporan* v. *Comm'r of Soc. Sec.*, No. 12 Civ. 6704 (JPO), 2015 WL 321832, at *30 (S.D.N.Y. Jan. 23, 2015); to seek information to fill in significant temporal gaps, *see Calzada* v. *Astrue*, 753 F. Supp. 2d 250, 273-74 (S.D.N.Y. 2010) (finding that the ALJ failed to adequately develop the record where a two-year gap in the record existed and

points to the MRI of her right knee, which she asserts supports her claim of persistent knee pain and her inability to walk or stand for long periods, stating that "[i]t seems that the ALJ just did not read any of the reports which [her] doctor provided." (Pl. Br. ¶ 6). Contrary to this assessment, however, the ALJ explicitly cited the MRI of Hannon's knee, noting that it "revealed a torn meniscus." (SSA Rec. 119). Similarly, he took note of her spinal MRI, observing that it showed "only minimal disc disease." (*Id.* at 120).

Furthermore, the ALJ explicitly discussed Hannon's treating physicians' records regarding her knee and back pain: He cited notes from Dr. R. Patel, which state that on August 27, 2013, despite reported knee and lower back pain, Hannon's "functional status remained good and her neurological examination showed normal motor strength in her upper and lower extremities." (SSA Rec. 119). The ALJ additionally observed that Dr. R. Patel made "no indication of use or need for an assistive device" (*i.e.*, a cane). (*Id.*). The ALJ further discussed the reports from Hannon's multiple physical therapy sessions at HHC, noting that she was capable of performing a number of physical exercises for a period of 45 to 60 minutes. (*Id.* at 120). He

---

evidence suggested the claimant's condition likely changed during that period); and to obtain any other information "necessary in order to properly make [a disability] determination," 42 U.S.C. § 423(d)(5)(B).

Here, however, Hannon does not argue that the ALJ failed to obtain relevant information; rather, she asserts that the ALJ ignored evidence already present in the record. (Pl. Br. ¶¶ 6, 12, 15). Moreover, the record contains no contradictions or temporal gaps suggesting the need to pursue additional evidence from treating sources. Finally, the Commissioner actively supplemented the record with a consultative examination from Dr. Thukral after determining that a consultative examination could not be obtained from Hannon's treating physicians. (SSA Rec. 130). Consequently, the lack of opinion evidence from Hannon's treating physicians does not constitute a dereliction by the ALJ of his duty to develop the record.

acknowledged that she had been prescribed a straight cane during a February 2013 physical therapy session due to her then-antalgic gait, but also observed that in late 2013, both Dr. R. Patel and Dr. Smoke had described her as having a normal gait.  (*Id.*).  Moreover, Hannon herself reported at the Hearing that she did not use a cane all the time, but only on occasions when her knee stiffened.  (*Id.* at 11-12, 120).  In short, the administrative record and the ALJ's opinion belie the contention that the ALJ failed to consider the extensive reports submitted by Hannon's treating physicians.  Rather, the record contains ample records and reports, cited by and in line with the findings of the ALJ, such that the ALJ's ultimate RFC finding is supported by substantial evidence.

### 2.    The ALJ Properly Assessed Hannon's Credibility

The Commissioner asserts that the ALJ properly weighed the credibility of Hannon's subjective account of her limitations.  (Def. Br. 20-21; Def. Reply 3-4).  Hannon's brief argues, however, that she informed the ALJ of her inability to do laundry and of her persistent numbness in her right hand, and suggests that he ignored those statements in finding that she was not disabled. (Pl. Br. ¶ 8).

As previously noted, when considering a claimant's symptoms and their impact on the claimant's RFC, the ALJ must (i) determine whether medically acceptable clinical and laboratory diagnostic techniques establish an underlying physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (ii) evaluate the intensity, persistence,

and limiting effect of the claimant's symptoms to determine the extent to which they limit the claimant's functioning.  20 C.F.R. § 404.1529(a)-(c).

When a claimant alleges that her symptoms result in a greater functional restriction than can be demonstrated by objective medical evidence, the ALJ considers evidence such as the claimant's daily activities; the type, dosage, effectiveness, and side effects of medications; treatments or pain relief measures; and other factors.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).  "The ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *McLaughlin* v. *Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980) (internal quotation marks and citation omitted).  A reviewing court will uphold the ALJ's decision to discount a claimant's subjective complaints, such as complaints of pain, so long as the decision is supported by substantial evidence.  *See Aponte* v. *Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  Moreover, "an ALJ's credibility determination is generally entitled to deference on appeal."  *Selian*, 708 F.3d at 420; *see also Torres* v. *Colvin*, No. 12 Civ. 6527 (ALC) (SN), 2014 WL 4467805, at *4 (S.D.N.Y. Sept. 8, 2014) (collecting cases).

In the present case, while the ALJ determined that Hannon's physical impairments could be expected to produce her symptoms, he did not credit Hannon's account of the degree to which those impairments limited her functioning.  (SSA Rec. 120).  In reaching this conclusion, the ALJ specifically considered the treatment notes from Hannon's physicians, corroborated by her

own statements at the Hearing, that she could travel alone, usually walk without an assistive device, and perform numerous activities of daily life.  (*Id.*). While Hannon did testify at the Hearing that she does not do laundry on her own due to the lifting involved, the ALJ noted that she testified to doing other chores, such as cooking and sweeping, and to lifting up to 10 pounds.  (*Id.*). The ALJ further noted that Dr. Thukral's consultative examination reflected no limitation on Hannon's ability to sit or stand, but moderate limits on her ability climb, pull, push, lift, and carry heavy objects due to her history of coronary artery disease and joint pain — all of which was consistent with the notes on file from Hannon's treating physicians.  (*Id.* at 120-21).  In short, the ALJ properly weighed the evidence before him and found that Hannon's account of the severity of the limitations imposed by her impairments was not fully credible.

### 3.    The New Evidence Presented to the Appeals Council Does Not Provide a Basis for Reversing the ALJ's Decision

Hannon states that she has continued to receive treatment and that "in the medical documents submitted after the hearing, especially from the doctors at FEGS dated May 5, 2014, it was determined that [she] was 'unstable in medical and mental health condition and require[d] treatment before a functional capacity could be made.'" (Pl. Br. ¶ 14).  Additionally, her supplemental evidence highlights her inability to have knee surgery as a consequence of needing to remain on medication for her heart condition; Hannon contends that this demonstrates the impossibility of resolving her knee

troubles, and states that the resulting pain renders her disabled.  (Pl. Br. ¶¶ 4-5, 7, 11).

A claimant may present additional evidence in support of her benefits application to the Appeals Council, so long as that evidence is new, material, and relates to the period on or before the ALJ's decision.  *Perez*, 77 F.3d at 45 (citing 20 C.F.R. § 416.1470); *accord Lesterhuis* v. *Colvin*, 805 F.3d 83, 87 (2d Cir. 2015).  Once evidence is added to the record, the Appeals Council must then consider the entire record, including the new evidence, and review a case if the "administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. § 404.970(b).  Where the Appeals Counsel denies review, the district court looks to the ALJ's decision and considers whether, in light of the entire administrative record — including any new evidence presented to the Appeals Council — there is "substantial evidence to support the decision of the Secretary."  *Lesterhuis*, 805 F.3d at 87.

In the present instance, nothing contained within the supplemental evidence submitted by Hannon to the Appeals Council tips the balance of the record such that the ALJ's decision would no longer be supported by substantial evidence.  Considering first the wellness plan completed by Dr. Mardam-Bey, this plan is dated August 21, 2014 — well after the ALJ's decision denying benefits, thus raising a question of whether it should even be fairly considered as new evidence.  (SSA Rec. 34).  Assuming, however, that the Court construes the wellness plan as "relating to" the period on or before the

ALJ's decision, the information contained therein does not significantly differ from the information contained in the prior record.[9]  Specifically, Dr. Mardam-Bey notes torn cartilage in Hannon's right knee, references the 2012 MRI, and indicates than an X-ray showed no degenerative changes.  (*Id.* at 35, 37).  Dr. Mardam-Bey does state that injections do not seem to be improving Hannon's condition and that she will likely need surgery, but also notes that because Hannon has been cleared to stop taking anti-coagulants for her heart, she may go ahead and have that surgery.  (*Id.* at 37).  Notes from Dr. Victor McLaughlin, to whom Dr. Mardam-Bey referred Hannon, indicate "mild medial and lateral marginal osteophyte formation" and unchanged "spurring of the tibial spines." (*Id.* at 36).  Joint spaces did not appear significantly narrowed and no effusion was seen, though a frontal view of the knee demonstrated "moderate medial compartment narrowing, with some small medial joint line osteophytes."  (*Id.*). In other words, the degenerative condition of Hannon's knee was largely unchanged from that revealed by her previous MRI, which was presented to and considered by the ALJ.  (*See id.* at 36, 38).

Considering next the notes of Dr. Paul Hobeika, which are similarly dated well after the ALJ's decision, he states that Hannon has a right torn

---

[9]     The fact that the new records submitted by Hannon are dated after the ALJ's decision does not, in and of itself, preclude the records from being considered as "new evidence": The Second Circuit has "determined that when … a diagnosis emerges after the close of administrative proceedings that sheds considerable new light on the seriousness of a claimant's condition, evidence of that diagnosis is material and justifies remand."  *Lisa* v. *Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991) (collecting cases, internal quotation marks omitted).  Accordingly, when confronted with evidence dated subsequent to the administrative proceeding, a court should consider whether that evidence suggests that, prior to the ALJ's decision, the claimant "had an impairment substantially more severe than was previously diagnosed."  *Id.*

meniscus and needs surgery, and that she is "temporarily unemployable" (a conclusion also reached by Dr. Mardam-Bey).  (SSA Rec. 40).  Dr. Hobeika's opinion regarding Hannon's employability is supported by no more than the fact of her torn meniscus and his surgery recommendation; and his conclusory assertion that Hannon is "temporarily unemployable" purports to make a determination that is reserved for the Commissioner.  *Snell* v. *Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Finally, considering the notes from FEGS WeCARE, which notes were completed by Dr. Hun Han, they largely corroborate the ALJ's findings.  Dr. Han found that Hannon had no travel limitations and could use public transportation; had no difficulty performing daily self-care tasks; could lift, push, and pull up to ten pounds frequently; could stand, walk, and perform repetitive bending, crouching, and stooping for one to three hours each; and had no limitation on her ability to sit, reach, or manipulate with her hands. (SSA Rec. 73, 80, 95-97).  Dr. Han's report did suggest slightly greater limitations on Hannon's ability to perform certain daily activities, insofar as it indicated that she could walk only half a block, could not climb stairs, and had difficulty with housekeeping.  (*Id.* at 80).  However, this assessment is at odds with Hannon's own account given to the ALJ at the Hearing, as well as the many reports submitted by her treating physicians — and is even somewhat contradicted by Dr. Han's own account of Hannon's functional capacity.

Because the new evidence submitted by Hannon's physicians does not materially alter the balance of information in the record, it provides no basis for disturbing the ALJ's decision.

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed; Defendant's motion for judgment on the pleadings is GRANTED; and Plaintiff's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     June 17, 2016
           New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge

*A copy of this Order was mailed by Chambers to:*

```
Jean D. Hannon
24 96 8th Avenue
Apt. 3C
New York, NY 10030
```